FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 APR -1 PM 2: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| STEPHEN E. HOLLICH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 93-PWG-2131-NE |
| | ) |
| DANIEL S. GOLDIN, | ) |
| | ) |
| Defendant. | ) |

ENTERED

APR - 1 1999

MEMORANDUM OF OPINION

Stephen E. Hollich brings this action pursuant to the provisions of the Age Discrimination and Employment Act (AEDA) of 1967. 29 U.S.C. § 621, *et seq.* This action was previously assigned to United States District Judge Edwin L. Nelson. Pursuant to the provisions of 28 U.S.C. § 636(c) the parties have consented to disposition of this action by the undersigned magistrate judge. For the reasons set forth below, judgment for defendant will issue.

I.    BACKGROUND

The events at issue relate to a job vacancy at the Marshall Space Flight Center in 1990.

A.    THE ORGANIZATION (Marshall Space Flight Center)

The Marshall Space Flight Center (MSFC) provides development and operational services to the manned and unmanned space projects of the National Aeronautics and Space Administration (NASA) from facilities located in part at or near the Redstone Arsenal Facility in Huntsville, Alabama. NASA has implemented such projects as the Space Shuttle, (NSTS), Space Station and Payload Systems for each including the Hubble Telescope and Tethered Satellite System

(TSS). Prior to January 1986 the MSFC had within its organizational structure a Safety Office. The "old" safety office, as it will be identified for the purposes of this opinion, played no direct role in space vehicle launch decisions. Input to the launch director concerning safety issues was made through project or engineering teams rather than directly from the safety office. In January 1986 the NSTS Challenger exploded shortly after lift off killing the seven astronaut on board. The tragic loss of Challenger (known at MSFC as 51-L) galvanized NASA and MSFC to initiate a review of pre-launch decision making and a complete re-evaluation of the safety structure and procedures. A presidential commission found the safety organization in existence prior to January 1986 to be in a "state of disrepair." In 1986 the safety office was reorganized under the general supervision of Mr. A. A. McCool, the director of the Safety, Reliability, Maintainability, and Quality Assurance Office. (Defendants' Exhibit #3). Mr. Charles Mauldin was appointed director for the Systems Safety and Reliability Office. The Systems Safety Engineering Division of the Systems Safety and Reliability Office was subdivided into three branches; the Project Safety Engineering Branch, Hazard Analysis Branch, and Safety Assessment Branch. (Defendants' Exhibit #3). The reorganized Safety Office was placed on par with the Engineering and Projects Groups within the NSTS and other programs. New technical employees were brought into the Safety Office. The interface between the MSFC and the Johnson Space Flight Center (JSFC) was reviewed, revised and strengthened. Safety protocol and mission charters were re-written. Charters for various organizations were revised to move safety functions and analysis under a single safety branch umbrella. These charter changes and realignments of safety responsibility were accomplished through negotiations involving various agencies contractors and branches. The "new" safety office assumed a direct rather than indirect role in pre-launch and launch decision making. Director Mauldin personally manned a terminal in the Launch

2

Control Room at the Kennedy Space Center (KSC) supported by the Huntsville Technical Teams at MSFC. The reorganization of the Safety Office which began shortly after the 51-L tragedy continued well beyond the first renewed flight of the NSTS two years later in the Fall of 1988. In each of the seven launches after the resumption of NSTS flights and prior to March 1990, the Huntsville Support Team included Paul Caraccioli as a Lead Team Member.

## B.    THE JOB

Following the reintroduction of NSTS flights, John Livingston, then the Chief of the Project Safety Engineering Branch, proposed the creation of a new position within the Systems Safety Office. The position was posted as a center-wide (MSFC) opportunity through a competitive placement plan (CPP) in March of 1990. (Plaintiff's Exhibit #1). The position was titled as "AST, Flight Systems Safety," with an employee classification of GS-13/14. This meant that a grade GS 13 was required before an application could be submitted and that the position carried the possibility of a future promotion to grade 14. The CPP had an opening date of March 15, 1990 and a closing date of March 28, 1990. The CPP described the duties for the position as

> DUTIES: Serves as an expert advisor for Systems Safety engineering activities in the Project Safety Engineering Branch, responsible for systems safety oversight on all assigned MSFC projects in direct support of the National Space Transportation System (NSTS), such as ET, RSRM, SRB, ASRM, SSME, ATD, etc. Incumbent applies all fields of engineering principals and systems safety analysis techniques to all activities required to manufacture, test, assemble, integrate, launch, and operate the flight hardware. The incumbent oversees MSTS level II Systems Safety Integration and Requirements' activities to assure interface and integration compatibility to the individual

3

> and collective flight hardware/software elements
> provided by MSFC. The incumbent actively
> participates in the required engineering reviews and
> systems safety review and approval milestones to
> assure systems safety assessment for all assigned flight
> hardware.

(Plaintiff's Exhibit #1).

Consistent with MSFC personnel policy, the CPP listed criteria by which candidates would be

evaluated. These factors, known by the acronym K-SOCS for Knowledge, Skills, Abilities and Other

Characteristics, were:

(1) Knowledge of systems safety design, analysis, and verification techniques as applied to aerospace systems.

(2) Knowledge of theories, principals, practices, and techniques of aerospace systems engineering.

(3) Knowledge of the systems safety interactions, and relationships of aerospace systems and environments.

(4) Skill in planning, managing, and directing innovative and highly technical programs.

The CPP designated K-SOCS (2) and (4) as defining "minimum qualifications" and K-SOCS (1) and

(3) were noted as "more important." The facility-wide CPP produced four candidates. One

candidate was a GS-12 with duties in the area of industrial safety. Applications for federal

employment known as the SF-171 were also received from Stephen Hollich (plaintiff's Exhibit #9),

Paul Caraccioli (plaintiff's Exhibit #10) and Luis Duarte another employee in the New Systems Safety

Office. Charles Mauldin, the supervisor and appointing official, delegated the task of interviewing

the candidates to John Livingston, Chief of the Projects Safety Engineering Branch. While Livingston

recognized that all three of the GS13 candidates met the minimum standards, he concluded that

Hollich and Caraccioli were the most qualified.

4

## C.    THE CANDIDATES

### (1)    Stephen Hollich

In March 1990 Stephen Hollich was fifty-seven years old (DOB 7-11-32) and had worked as an aerospace engineer for thirty years.  Mr. Hollich at the time of the CPP had a BS degree in electrical engineering from Indiana Tech and a Masters in Business Administration from Alabama A&M University in Huntsville, Alabama.  Hollich had worked in approximately thirteen (13) engineering jobs in Huntsville from 1963 through 1990.  At various times Mr. Hollich was an MSFC employee and at other times he worked with contractors providing engineering services to MSFC.  Much, but not all of his work was in the general area of aerospace engineering.  From 1963 through August of 1965 Mr. Hollich was employed by ARARENIC, Inc. in Huntsville, a MSFC contractor, as reliability systems group supervisor.  From 1965 until 1971 he worked as branch chief, then as section chief for SPACO, Inc., a NASA contractor at MSFC.  When the SPACO contract ended, Hollich was employed by Martin-Marietta from 1971 until 1974 within NASA as group leader in the Skylab Project in the area of systems safety.  When the Martin-Marietta contract ended, Hollich worked seven (7) months for a testing firm known as New Technologies, Inc.  After leaving New Technologies he taught electrical engineering at the Alverson Draughn College and at Calhoun Community College.  In May of 1976 Mr. Hollich was hired by Northrup as a consultant.  The project to which Hollich was assigned was abandoned but he was hired by Northrup as an in-house employee in hazard analysis until 1978.  Hollich left Northrup to work with Management Systems, Inc.  In this position he performed no engineering or aerospace engineering work.  In 1980 Hollich went to work for SCI Systems in an engineering position that did not involve aerospace engineering or systems

safety.  In 1981 Hollich began working in the "old" safety office at MSFC as a systems safety engineer under Jack Walker.  Hollich was assigned to the External Tank (ET) Project.  John Livingston was also employed with the "old" safety office and, like Hollich, was a subordinate of Mr. Walker.  In March 1985, Hollich left the safety office to work on the Space Station Project.  In this job Mr. Hollich reported to Mr. Robert Crumbley from 1985 through 1988.  Mr. Crumbley was the AST supervisor and branch chief.  In 1988 he transferred to the Materials Selection and Control Office under the supervision of R. M. Hargrove.  In October 1988 Hollich was assigned to work on the EHO-2 Project in a laboratory and testing engineering position.

In addition to his formal education Mr. Hollich attended numerous workshops and took courses, many of which were related to engineering, safety and management.  (Plaintiff's Exhibit #1).  In general Mr. Hollich's work resulted in employee performance evaluations which indicated he met, but rarely exceeded, position expectations.  For example, Mr. Walker, the director of the "old" safety office, noted in October 1982 that Mr. Hollich had "... met the basic requirements of [his] position."  (Defendants' Exhibit #28).  In 1983 Walker again observed that Hollich had met basic requirements and did not indicate that he had exceeded expectations in any area during the reporting period.  (Defendants' Exhibit #29).  The 1984 review indicated that Mr. Hollich met requirements while also recognizing his contribution to successful tests of the External Tank.  (Defendants' Exhibit #30).  While supervised by Mr. Crumbley in 1985, Hollich received four annotations that he had met expectations and in two areas, participation in the space station phase B milestone and interface, he exceeded expectations.  The review by Mr. Crumbley specifically noted that "... he has exhibited good technical judgment and aptitude in space station systems safety area...."  (Defendants' Exhibit #31).  In 1986 Crumbley noted that Mr. Hollich had met expectations in seven of nine areas and exceeded

6

expectations in two. He also praised Hollich for his contribution to the employee picnic. In 1986 Crumbley rated Mr. Hollich as meeting expectations in seven areas and exceeding expectations in one category–his participation in a phase of space station evaluation. (Defendants' Exhibit #33). Hollich's 1988 and 1989 evaluations after leaving Mr. Crumbley's organization noted that he had "met all performance requirements" (Defendants' Exhibit #34) and "performed successfully ..." and done "... a competent and credible job." (Defendants' Exhibit #35). In evaluating for the position under the CPP, Livingston found that Hollich was found to be qualified to perform the job as outlined in the Competitive Placement Plan.

### (2)    Paul Carracioli

In March of 1990 Paul Caraccioli was thirty-five years old (DOB 3-12-55). Caraccioli had received a degree in mechanical engineering from the University of Alabama in Huntsville in 1978. Prior to his service at MSFC he had worked as an engineer with the Bellefonte Nuclear Plant with the Tennessee Valley Authority. In September of 1985, six months after Hollich was assigned to the space station, Caraccioli came to work with the Project Systems Engineering Branch of the Safety, Reliability, Maintainability and Quality Assurance Office on the Space Shuttle Project. He reported to John Livingston, D. B. Channell, and Charles Mauldin. With the loss of 51-L an extensive and intense reorganization of the Safety Office followed. A part of the reorganization was a complete review of system safety procedures in the Project Safety Engineering Branch. The re-evaluation involved creating assessment and review teams for the External Tank (ET), Solid Rocket Motor (SRM), and the Redesigned Solid Rocket Motor (RSRM), the Shuttle Main Engine (SME), and the Solid Rocket Booster (SRB). Paul Caraccioli was named as lead engineer and team leader for the

7

SRB and SRM (SDSRM) groups. John Livingston led the other groups and directly supervised a GS-12 engineer as well as received reports from Caraccioli on the activities of the SRB and SRM groups. During this period of time, critical decision making processes were re-evaluated and substantially modified. Fault tree and spider tree decision making schemes were re-written and modified. Throughout these reviewed, Paul Caraccioli served as liaison to the JSFC in negotiations which led to revised charters concerning safety responsibilities. When the NSTS program began a renewed launch schedule in the Fall of 1985, Caraccioli was lead engineer for two of the Huntsville MSFC Teams providing direct engineering data to Mauldin at KFC during launch. Caraccioli also works with MSFC contractors both prime and mission support in designing and implementing new safety programs. He often acted as the Systems Safety Branch representative on committees making presentations to program management.

In September 1986, John Livingston completed a performance appraisal of Caraccioli. He rated Caraccioli as having exceeding requirements in all categories. Livingston noted Caraccioli's contributions to the post-51-L investigation and reassignment. (Defendants' Exhibit #23). In 1987 Livingston again found Caraccioli to had exceeded requirements as a Systems Safety Engineering Lead. (Defendants' Exhibit #24). This appraisal was reviewed by D. B. Channell as Chief of the Systems Safety Engineering Division. In 1988, Caraccioli was found to have again exceeded expectations in a report by Livingston to Channel. In the report, Livingston noted that Caraccioli had made substantial contributions during participation in Level IV and III and II.5 reviews of pre-flight assessments for STS-26. (The Fall 1988 Shuttle Launch). (Defendants' Exhibit #25). The 1989 appraisal also indicted that Caraccioli had exceeded expectations. He had participated in pre-flight

8

assessment reviews (PARs) for five STS missions in 1989. He was a participant in key project reviews providing management with safety assessments. (Defendants' Exhibit #26).

**D.     THE SELECTION PROCESS**

There were four applications received in response to the CPP (CPP-90-63-RE). These were forwarded to Mauldin. (Defendants' Exhibit #4). The deadline for submission of applications was March 28, 1990. On March 28, 1990 Paul Caraccioli wrote to Frank Bynum, the Director of the Personnel Office, indicating that his work on an upcoming NSTS launch prevented his timely completion of the application. He requested until April 2, 1990 to provide the application and supporting materials. After all applications and supporting material had been received, Mauldin designated Livingston to conduct the candidate interviews. Livingston had never conducted interviews in a CPP process. He devised a checklist which he followed and annotated during the discussion. (Defendant's Exhibit #22). While generally tracking the K-SOCS of the CPP, the outline also sought to elicit information related to experience with the NSTS (Shuttle) in safety, knowledge and career plans. The interview concerned Shuttle safety topics, however, the CPP was not limited in description or in the associated K-SOCS to post-51-L (Challenger) systems safety experience. Livingston was a contemporary of Hollich having worked with him in the "old" safety office, although they were assigned to different projects. Livingston was the immediate supervisor of Caraccioli and had completed Caraccioli's employee performance appraisals. After considering the applications, other material and the interview on May 3, 1990, Livingston recommended to Mauldin that the position advertised in CPP-90-63-RE go to Caraccioli. (Defendants' Exhibit #16). On May 31, 1990 Hollich was advised of Caraccioli's promotion. (Plaintiff's Exhibit #8). Hollich objected to the

9

appointment of Caraccioli. He filed an age discrimination complaint with an EEO counselor on June 4, 1990.

## II.    APPLICABLE LAW

The Age Discrimination and Employment Act (ADEA) of 1967, codified at 29 U.S.C. § 621, *et seq*., states in pertinent part that it shall be unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (1994). In 1974 certain federal employee became entitled to protection under the Act. 29 U.S.C. § 633a. "The ADEA is remedial, as opposed to substantive, in nature, and its scope is narrowly confined to combat the unlawful conduct which Congress sought to prevent." *Hornfeld v. City of North Miami Beach*, 29 F. Supp.2d 1357, 1365 (S.D. Fla. 1998). The legislative history of the ADEA shows Congress's intolerance for arbitrary age limits that overlooks some individuals' abilities. *See EEOC v. Wyoming*, 460 U.S. 226, 231, 103 S.Ct. 1054, 1057-58, 75 L.Ed.2d 18 (1983). Whenever age is a factor in an employment decision, the ADEA is implicated. "The ADEA does not [however] authorize the court to interfere with employer's decisions regarding which of several qualified candidates should be hired [promoted], in the absence of evidence that unlawful considerations of age tainted the selection process." *Dilla v. West*, 4 F. Supp.2d 1130 (M.D. Ala. 1998) (1998 W.L. 229850 (M.D. Ala.)); *citing Dupre v. Fru-Con Eng'g, Inc.*, 112 F.3d 329, 335-36 (8th Cir. 1997) (which noted that the ADEA does not "require that an employer retain those employees whom the court or the jury considered most qualified for the job." But "only that the employer's decision not be based on age. When an employer decides to discharge one employee and

not to discharge another and his determination is reasonably attributable to an honest and non-discriminatory, though partially subjective, evaluation of the employee's qualifications, no inference of a violation of [ADEA] can be drawn.").

A plaintiff seeking redress under the ADEA is not required to prove that age was the sole or exclusive reason for the defendant's decision.  It is only necessary for plaintiff to prove that age made a difference in the decision.  (Pattern Jury Instructions, Civil Cases, U.S. 11th Circuit District Judges Association 1994).  *Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1050 (11th Cir. 1989).  *Harring v. CPC International, Inc.,* 664 F.2d 1234 (5th Cir. 1981).  "In an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Jameson v. Arrow Company,* 75 F.3d 1528, 1531 (11th Cir. 1996).

Plaintiff may chose one of three ways to show age discrimination under the ADEA to establish a *prima facie* case:

(1)     Direct evidence of discriminatory intent;

(2)     Statistical proof of disparate treatment; or

(3)     Meeting a modified test of *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*See Isenbergh v. Knight-Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 439 (11th Cir. 1996), *cert. denied,* ___ U.S. ___, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997).  In *Clark v. Coats and Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir. 1993), the Court of Appeals for the Eleventh Circuit stated that direct evidence of employment discrimination is evidence that "is sufficient to prove discrimination without inference or presumption."  Not every remark regarding a person's age provides direct evidence of

11

bias. *Young v. General Foods Corporation*, 840 F.2d 825, 829 (11th Cir. 1988). "Courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, to constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989). For example, a management memorandum stating that an employee should be fired because he is "too old" would constitute direct evidence. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

A plaintiff may also proffer statistical evidence. Statistics presented without an analytical foundation are however "virtually meaningless." *Brown v. American Honda Motor Company, Inc.*, 939 F.2d 946, 952 (11th Cir. 1991). As the Eleventh Circuit recently confirmed, "statistics alone cannot make a case of individual disparate treatment." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 645 (11th Cir. 1998). An individual plaintiff must point to some specific instance of discrimination in order to be entitled to a remedy. *Id; Vincent v. Wells Fargo Services, Inc. of Florida*, 3 F. Supp. 1405, 1415 (S.D. Fla. 1998). "While statistics are often important in class action and disparate impact cases, they are of 'relatively low importance in a case of individual disparate treatment.'" *Langston v. Carraway Methodist Hospitals of Alabama*, 840 F. Supp. 854, 863 (N.D. Ala. 1993) (quoting *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n.8 (7th Cir. 1990)). Generally, statistical evidence by itself is insufficient to give rise to the inference of discrimination but, if done in conjunction with other elements, may satisfy the plaintiff's ultimate burden. *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1293 (11th Cir. 1989).

Due to the difficulty of accumulating direct evidence of discriminatory intent or statistical proof of a pattern of discrimination, the use of indirect evidence is the more common approach employed by a prospective plaintiff. *Wilson v. AAA Plumbing, Corp.*, 34 F.3d 1024, 1027

12

(11th Cir. 1994). Indirect or circumstantial evidence is sufficient to prove a *prima facie* case of age discrimination in the promotion context by satisfying a modified portion of the four part test of *McDonnell-Douglas Corp v.* Green, 411 U.S. 792, 93 S.Ct. 1817, 35 L.Ed.2d 588 (1973). Under this test, Mr. Hollich must prove that:

> (1)     He is a member of a protected age group of 40 to 70 under 29 U.S.C. § 631(a) (1988);
>
> (2)     That he was not promoted to a given position;
>
> (3)     That another person, generally outside the protected age category, was placed in the position at issue; and
>
> (4)     He was qualified to fill the position he sought.

*See Ford v. General Motors Corporation*, 656 F.2d 117, 118 (5th Cir. 1981).

As the prohibitions of the AEDA were derived from Title VII, decisions under analogous sections of Title VII are "highly relevant" to issues under the ADEA. *See EEOC v. Reno*, 758 F.2d 581, 583-84 (11th Cir. 1985). Similarly, burden of proof allocations in ADA cases are the same as in cases arising under Title VII. *See Harriston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993) ("The Eleventh Circuit has adapted to issues of age discrimination the principals of law applicable to cases arising under the very similar provisions of Title VII.") (*quoting Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)). Once the plaintiff establishes a *prima facie* case of discrimination it raises a presumption that the defendant discriminated against the plaintiff. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1521 (11th Cir. 1991), *citing McDonald*, 411 U.S. at 802-03; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden then shifts to the defendant "to rebut the presumption by

13

producing sufficient evidence to raise a genuine issue of fact as to whether the defendant discriminated against the plaintiff [by] ... articulating a 'legitimate, non-discriminatory reason for its actions against the plaintiff, a reason which is clear and worthy of credence.'" *Id.* Because the defendant need only produce, not prove, the non-discriminatory reason, the burden "exceedingly light." *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11ᵗʰ Cir. 1983); *Turnes v. AmSouth Bank, M.A.*, 36 F.3d 1057 (11ᵗʰ Cir. 1994). If the employee successfully produces a non-discriminatory reason for its action, the presumption of discriminatory disappears. The plaintiff then has the opportunity to show the employer's proffered reason to be pretextual. *Id.* at 256, 101 S.Ct. at 1095.

## III.    THE DIRECT EVIDENCE CASE

Direct evidence, if believed and accepted by the finder of fact, alters the burden of proof at trial. If direct evidence proves, as by definition it must, that the defendant intentionally discriminated against Mr. Hollich, the inquiry into that issue is at an end. The defendant may escape liability, however, if the defendant proves by a preponderance of the evidence that the same employment decision would have been made if they had not used the proscribed criteria. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Where there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available. *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d at 1453; *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11ᵗʰ Cir.), *cert. denied*, 467 U.S. 1209, 104 s.Ct. 2385, 81 L.Ed.2d 344 (1984). Once the plaintiff produces direct evidence and the trier of fact

14

accepts this evidence "the ultimate issue of discrimination is proved." *Bell*, 715 F.2d at 1556. As direct evidence alters both the both the burden of proof and possible relief such evidence must be considered first.

### (A)   PROMOTIONS SUMMARIES

In his "direct evidence" case, Mr. Hollich introduced a summary of GM15 and GM14 promotions he had prepared from data received during discovery.[1] The list included the CPP number for thirteen GM14 and GM15 positions for the Science and Engineering Laboratory for the years 1989 and 1990 and the ages of the applicants. (Plaintiff's Exhibit #26 and #27). Of the thirteen scheduled vacancies, twelve were filled. In eight of the twelve, a person under forty was selected for the position. (Plaintiff's Exhibit #26). Mr. Hollich also prepared an exhibit which indicated that in eight of eleven promotions, the youngest candidate was selected (Exhibits #27, #28, #29 and #30). When candidates were both under the age of forty and over the age of forty the younger candidate was selected seven out of eight times. (Exhibit #31). For the same period, the defendants produced promotion data indicating that in GM14/15 promotions facility-wide, the average age of the person promoted was 46.658 for the period June 1989 to June 1990. The defendants did not, however, eliminate from the calculation of these promotions those in which all candidate for the promotion were over the age of forty. A plaintiff may establish a *prima facie* case of age discrimination through statistics demonstrating a pattern of discrimination. *Earley v. Champion Int'l Corp.*, 907 F.2d at 1081. Direct evidence of discrimination, however, is evidence of such a quality that it would "prove

---

[1]      The GM designation connotes a management position as opposed to the GS (General Schedule) designation generally applicable below grade 14.

15

the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 582. As noted above, statistics are relatively unimportant in a case of individual disparate treatment. *Langston v. Carraway Methodist Hospitals of Alabama*, 840 F. Supp. 863. The evidence presented here does not "prove the existence of discrimination without inference or presumption." *Carter v. Three Springs Residential Treatment*, 132 F.3d 641. Such evidence must be truly focused on the discrete employment action at issue. While the evidence may be considered in assessing the existence of a *prima facie* case, the data contained within the exhibits as presented to the court do not constitute "direct evidence" of age discrimination. *Pace v. Southern Railway System*, 701 F.2d 1383, 1388 (11th Cir. 1983).

## (B) COMMENTS OF J. R. THOMPSON

Mr. Hollich testified that sometime prior to March of 1990 he heard Mr. J. R. Thompson, then the MSFC Director, later to become the director of NASA, speaking to a group of GS14/15 managers in an auditorium in the 4200 or Headquarters Building. Hollich testified that he heard Thompson say "look at all the white hair in this room. Who's going to be running this place in twenty years? We need to bring along our younger people."[2] The comments of Thompson do not constitute direct evidence of discrimination. Such evidence to be considered direct evidence must focus on the employment action at issue. Hollich testified that he heard this statement "in 1990." [3] Not only must the evidence be of discriminatory "actions or statements of an employer," but the

---

[2] Hollich was not a participant at the meeting. He heard Thompson speaking and went into the auditorium. There is no evidence of what was said before Hollich arrived or if Hollich remained until the address was concluded.

[3] There is no indication whether this statement was made before March 28 or after May 3 and before December 31 or between March and May 3, 1990.

16

actions or statements at issue must "correlat[e] to the discrimination or retaliation complained of by the employee." *Carter v. Three Springs Residential Treatment*, 132 F.3d at 641. The statements "must be made by a person involved in the challenged decision," *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453-54 (11th Cir. 1996), and must not be subject to varying reasonable interpretations. *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189-90 (11th Cir. 1997). Comments which merely "suggest discrimination, leaving the trier of fact to infer discrimination based on the evidence" is circumstantial evidence rather than direct evidence. *See Earley*, 907 F.2d at 1081-82. Discriminatory remarks by the decision-maker can, of course, constitute direct evidence of age discrimination. *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997). However, a plaintiff may not rely on remarks as direct evidence of discrimination unless they were uttered by the decision-maker in the challenged action himself, or, at the very least, by a person somehow involved in, or having an influence on, the decisional process. *Holifield v. Reno*, 115 F.3d 1555, 1563-64 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personal decision are not probative in an employment discrimination case."); *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d at 1453-54 ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged action."); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("Stray remarks in the workplace ... statements by non-decision-makers or statements made by decision-makers unrelated to the decisional process itself" do not constitute direct evidence of discrimination.). Thus, comments that "new blood" is needed and plaintiff's advancing age impeded [her] appointment would constitute direct evidence of discrimination. *Buckley v. Hospital Corp. of America, Inc.*, 758 F.2d 1525, 1530 (11th

Cir. 1985). On the other hand, the statement that the work force required "young blood" may support an inference of an impermissible reliance on stereotypical assumptions regarding the relationship between age and ability but does not compel the conclusion. Also, Thompson's comments are subject to more than a reasonable interpretation. In 1990 Thompson, in the brief comment overheard by Hollich, was referring to the management that would be in place in the year 2010. To suggest "bringing along" younger people does not prove age discrimination without inference. Thompson's comments are not direct evidence of discrimination. Finally, there is no evidence that Mauldin, Livingston or McCool attended the meeting. There is no evidence of a policy to promote younger candidates over older ones.

### (C)   COMMENTS OF JOHN LIVINGSTON

Mr. Hollich testified that during his interview, Livingston told him that "[he] was perhaps a little too mature for that position." Hollich testified that at the time he "wasn't sure that [the comment] was meant 'that way' [as a comment on his age]." Discriminatory remarks by the decision maker can constitute direct evidence of discrimination. *Zaben v. Air Products and Chemical, Inc.*, 129 F.3d at 1456. While the definition of direct evidence has been subject to somewhat different shadings in our Circuit, statements attributed to the decision maker establishing intentional discrimination not subject to varying reasonable interpretations, if believed, prove intentional discrimination. It is perhaps possible to conclude that Hollich's own inability to immediately recognize that the statement he claims to have been made by Livingston was patently discriminatory, suggests that the statement was subject more than one reasonable interpretation and, thus, does not constitute direct evidence. The court, however, finds that the statement as related in

18

testimony by Mr. Hollich and attributed to Mr. Livingston simply was not made. "When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of discrimination. Absent any reference to the direct evidence, it is unclear how the court below found." *Thompkins v. Morris Brown College*, 752 F.2d 558, 564 (11th Cir. 1985), *quoted in Equal Opportunity Commission v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990). The court finds first that the statement was not made because Livingston denied making it. Livingston was the more credible witness on this issue. In making that credibility determination the court considered, in addition to the credible testimony, Hollich's contemporaneous EEO report. (Court's Exhibit #1 offered by plaintiff). In recording Mr. Hollich's complaint on June 4, 1990 the EEO investigator noted that

> Mr. Hollich feels he was denied this position because of age discrimination. Mr. Hollich was asked why he feels he was denied the position, because of age discrimination. He stated that he had much more experience than Mr. Carracioli, that he had been in management before, with fifteen engineers under his supervision. In fact, Mr. Hollich's management experience covers a sixteen year period. He has more seniority, and is several years older than Mr. Carracioli. Mr. Hollich is over fifty years old and Mr. Carracioli is thirty-five years old. Mr. Hollich stated that he had been passed over at least two other times on supervisor's announcements because of his age. (emphasis added).
>
> Mr. Hollich stated that in each and every case he had been given the exact name of the person who would be selected prior to the Competitive Placement Plan (CPP) being given to the selecting official and one time even in advance of the announcement of the CPP. Also in each and every case, at the time of the

> placement, the person selected was age forty or under
> while he (Mr. Hollich) was over the age of fifty.

(Court's Exhibit #1, p.1).

Mr. Hollich testified at trial that he spoke with the EEO coordinator in a "question and answer"

format and was not asked about what Livingston said. It is incredible, however, that a man who had

"been passed over at least two other times on supervisor's announcement because of his age" would

overlook to tell voluntarily the EEO coordinator that the evaluator had specifically informed him that

he was "too mature for the position." It is equally incredible that an EEO counselor would fails to

record such a statement or raise the allegation later with Maulden or Livingston.

On November 8, 1990 Mr. Hollich submitted *pro se* an affidavit in support of his claim

of age discrimination. (Defendant's Exhibit #46). In his affidavit, he stated that

> 2.      John Livingston did the interviews for
> candidates who were referred as the best qualified in
> response to the vacancy announcement CPP 90-63-
> RE, AST Flight Systems Safety, GS861-13/14.
> Charles Mauldin signed the selection notice, not Mr.
> Livingston. Mr. Mauldin is Mr. Livingston's second
> level supervisor.   I was not interviewed by Mr.
> Mauldin.
>
> 3.      During the interview with Mr. Livingston, the
> only remarks he made to me were in my regard to my
> ability.  He said that I had a highly valuable qualified
> background. He was familiar with my experience as
> we had previously worked together in Systems Safety
> for about four years. During the interview, he told
> [me] that he made the recommendation for selection to
> his supervisor, but it was rare if his recommendation
> was not accepted. He told me I could do the job
> without any difficulty. He did state he had not been
> aware that I had so much safety experience (twenty
> years). (emphasis added).

20

4.      During the interview Mr. Livingston did not mention any special needs or requirements in "systems safety" nor did the vacancy announcement list this. This is a post 51-L (Challenger accident). I was not advised this experience was needed or required.

5.      After the selection was made and the EEO complaint filed, Mr. Livingston telephoned and told me that post 51-L experience was the sole reason he selected Paul Carracioli and that he never thought of me as being old. I asked why he did not mention 51-L during the interview as I had more applicable experience. He replied that he did not want to argue or have a contest over this. He said he just called to explain his selection.

6.      During the interview I was told I was the "best candidate so far" but that he still had to interview one or two more. This was based on my experience----especially safety experience which was exceptionally strong. ...

7.      I was told by at least three employees in the CS-21, where the position is located, that Paul Carracioli would be selected. This was prior to my interview. I was also told that Mr. Carracioli was, or had been, groomed for the position.

8.      I have applied for only one other grade 14 position in the past two years. After I applied, two weeks later I was notified it was canceled. I later learned from another employee that the position was filled by reassignment and that the employee had held the job for two weeks prior to the vacancy announcement being canceled. ...

9.      I believe that I was discriminated against because of my age (58) in that a younger employee (age 35) with less experience was selected.

Again, as with the EEO complaint, despite detailed references to the interview and what was said by

Livingston, Hollich did not mention in November of 1990 his claim that Livingston had told him he

was "too mature for that position."

                In an affidavit submitted May 14, 1992, with the assistance of counsel, Mr. Hollich

noted that:[4/]

> When I attended the interview with Mr. Livingston if
> he had any question about my payload activities or
> space station activities he neglected to mention them
> to me or to ask for clarification which I would have
> been most happy to supply. At no time did he make
> any remark or ask any question that could be
> construed as not accepting my credentials exactly as I
> had presented them and present them here. We did
> discuss the fact that I have two families. Indeed, all
> three of my children of my first family had visited the
> Safety Office while Mr. Livingston and I had worked
> there and had been introduced to all of the personnel
> present; also I had brought coffee for the entire Safety
> Office for a full week when the first two children of
> my second family had been born and one week after
> my interview with Mr. Livingston I was again
> distributing cigars and candy to Safety Office
> personnel. (Mr. Livingston took a role of Lifesavers
> as he doesn't smoke). It would be very hard for
> anyone to ignore the fact that I am, at least, more
> mature than most of the newer employees. During the
> interview I did make it a point to tell him of my Space
> Station Systems Safety activities and of my S.E.B.
> lead man status and also mentioned my commendation
> and awards for the Source Evaluation Board activities;
> that I had extensive education; having taken a lot of
> safety course; was willing to learn and that I felt I had
> some pretty powerful references.
>
> When the selection was made I was hurt, shocked and
> then angry because I was certain that I had better

---

[4/]      Mr. Hollich was assisted by another attorney, not by his trial counsel.

> credentials for the job and that some reason other than
> merit had been used to determine Mr. Livingston's
> choice. When Mr. Livingston telephoned me several
> days later, he said to explain his selection, he said that
> he had to have someone in that job who had post 51-L
> experience. (I had actually been assigned to the Safety
> Office "post 51-L") albeit only a short time. When I
> asked him why he did not mention this to me in the
> interview or give me a chance to show him that I
> might have had equivalent experience he said "I don't
> want to argue about this, I only wanted to explain"
> and hung up the phone. ... There are many ways of
> exhibiting age discrimination. I did not expect that
> Livingston would come right out and say, "Steve,
> you're too old for this job. I want a younger man like
> Paul Carracioli." His method was to: (1) lower the
> requirements that personnel had to look for to assure
> that Carracioli could meet the minimum requirements
> for the job...    (2) Increase Carracioli's years of
> experience on the evaluation matrix to make it look
> like he has more qualifications than he actually has ...
> (3) Minimize my activities and contribution.

(Defendant's Exhibit #47). (emphasis added).

Again, Mr. Hollich makes detailed references to events occurring during the interview without

recalling that Livingston had told him that he was "too mature for that position." Indeed Hollich

specifically notes that he did not expect Livingston would "come right out and say, 'Steve, you're too

old for this job. I want a younger man like Paul Carracioli.'" If his trial testimony were correct, that

is precisely what he was told by Livingston and as directly as can be imagined.

              A second reason the court finds Livingston's recollection more credible than that of

Mr. Hollich is that Livingston had served as an EEO counselor from 1979 until 1986. Livingston was

required to give up the EEO counselor's position when he was appointed as a manager. Whether

viewed optimistically or cynically, Livingston's experience casts doubt on Hollich's recollection of

the interview. If Livingston had learned from his EEO service the importance of ensuring advancement opportunities to all qualified workers without regard to age it is less likely that he would make such a statement as that attributed to him by Hollich than would someone without such experience. If viewed cynically, it is equally unlikely that Livingston would make such a statement because his EEO counselor experience would alert him to the possibility that such a statement would most inconveniently surface at a later time.

The testimony of both Livingston and Hollich suggests yet a third reason why Mr. Hollich's recollection of events is suspect. Much of the trial testimony focused on the comparison between the systems safety experience of Stephen Hollich and Paul Carracioli. Livingston maintained that Hollich's systems safety experience predated the 51-L tragedy. Livingston believe that Carracioli's post 51-L experience was the critical determining factor in comparing the two candidates. Throughout his testimony, Livingston used the word "mature" in describing progression of events and dating projects. For example, he testified that the Project Level Payload Safety and Suitability Analysis for the NSTS brought about the development of the new Safety Office. (His testimony was "as the program 'matured'" ...). In describing the Space Station Freedoms Progression, Livingston also used the term matured ("as the Station matured..."). Later in his testimony, Livingston again referred to the maturation of the Space Station and other projects. ("The Station was maturing ... other things were maturing."). Mr. Hollich also used the term to describe a past project. The use of the term mature by both Hollich and Livingston suggests that Mr. Livingston may well have observed that Hollich's systems safety skills were too mature as compared to those of Carracioli in the context of post 51-L systems safety experience.

24

For the reasons set forth above and based upon the observation of the court of the testimony of the two persons who attended the meeting, the court finds as a matter of fact that John Livingston did not tell Stephen Hollich that he was "too mature for the position." Based upon that finding and the findings set forth above, the court also finds that there is no direct evidence of discrimination.

## IV.   THE CIRCUMSTANTIAL EVIDENCE CASE

Under *McDonnell Douglas* a ADEA plaintiff must first establish a *prima facie* of intentional discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 824. A valid *prima facie* case creates a presumption that discrimination has occurred. *See Burdine*, 450 U.S. at 254 n.7, 101 S.Ct. at 1094 n.7; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied sub nom. Combs v. Meadowcraft Co.*, ____ U.S. ____, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *Crawford v. Western Elec. Co.,*, 745 F.2d 1373, 1376 (11th Cir. 1984). If the *prima facie* case remains unrebutted, the plaintiff is entitled to judgment in his favor as a matter of law, provided that the trier of fact believes the evidence put forward to establish the *prima facie* case. *See Combs,* 106 F.3d at 1528 ("If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter a judgment for the plaintiff because no issue of fact remains in the case." *Citing Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). The defendant may rebut a *prima facie* case of intentional discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment decision of which the plaintiff complains. Although this burden is not "onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094, neither is it merely a formality. The defendant may not satisfy his burden by presenting a hypothetical reason for the employment decision

25

in question; instead, it must raise "a genuine issue of fact as to whether it discriminated against the plaintiff" by making that decision. *Id.* at 255; 101 S.Ct. at 1094. In other words, "the defendant must clearly set forth, through the introduction of admissible evidence," the reason for its adverse employment decision, and that reason "must be legally sufficient to justify a judgment for the defendant." *Id.*; *see also Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d at 1455.

In *Crawford v. Western Elec. Co., Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980), the Fifth Circuit observed that a plaintiff may establish a *prima facie* case of promotion discrimination by proving that (1) he or she is a member of a protected minority; (2) was qualified and applied for the promotion; (3) was rejected despite these qualifications; and (4) that employees of equal or lesser qualifications who are not members of the protected minority were promoted. Recently the Eleventh Circuit clarified the fourth prong of the *prima facie* case by reiterating that "since *Burdine*, [the Circuit has] continually recognized that the relative qualifications [issue] belongs in the rebuttal stage of the *McDonnell Douglas* framework, not the *prima facie* stage." *Walker v. Mortham*, 158 F.3d 1177, 1190 n.29 (11th Cir. 1998). While Mr. Hollich retains the ultimate burden of persuasion, Circuit precedent makes clear that he has an opportunity to demonstrate that defendant's proffered reasons for its decision were not its true reasons. In doing so, he is not limited to presenting evidence of a certain type. Mr. Hollich might seek to demonstrate that defendant's claim to have promoted a better qualified individual was pretextual by showing that he was in fact better qualified than the person chosen for the position. In order to establish a *prima facie* case Mr. Hollich need not prove that he was in fact the superior candidate. He may seek to prove his superior qualifications, however, in order to demonstrate that the defendant's proffered reasons for selecting Carracioli were pretextual

26

and that the motivating factor was discrimination based upon his age. *Id.* at 191-192.[9] Mr. Hollich has established a *prima facie* case of intentional discrimination by offering evidence that he was within the protected class and qualified for the position which was awarded to a person outside the protected group.

The evidence is clear that the interviewing official, John Livingston, viewed Stephen Hollich and Paul Carracioli as the most qualified candidates for the position announced in CPP 90-63-RE. Livingston testified that after reviewing the applications (the SR171's) and comparing the relative experience and abilities in Flight Systems Safety in the post 51-L environment he concluded that Paul Carracioli was the superior candidate. Mr. Hollich challenges Livingston's conclusions and maintains that discrimination on the basis of age was a motivating factor in Livingston's decision. Mr. Hollich carries his ultimate burden of proof if he can demonstrate that a discriminatory reason more likely than not motivated the employer's decision or by discrediting the employer's proffered explanation. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1228. Under this approach, Mr. Hollich may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [all of those reasons] unworthy of credence." *Combs v. Plantation Pattern*, 106 F.3d 1538 (internal quotation marks and citations omitted).

---

[9]     "Although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualification before then; she need only prove that she herself was qualified to perform the coveted job." *Walker*, 158 F.3d at 1192.

27

On May 3, 1990 John Livingston sent a memorandum to Charles Mauldin with

reference to the candidate selection for CPP 90-63-RE. The memorandum stated in pertinent part:

> I have personally interviewed the four candidates for
> the position of Lead Engineer for NSTS projects in the
> Projects Safety Engineering Branch.
>
> Based upon the candidates responses to questions
> asked during the interview and supporting information
> provided by the candidates' (SF-171-2, Form 3804,
> KSOC's, commendations, awards, etc.), Mr. Paul
> Carracioli was judged to be the best overall candidate.
> I am developing a summary for each candidate's
> qualifications which I can provide, if you desire.

(Defendant's Exhibit #16).

Livingston was personally familiar with both candidates. He had served with Hollich

through early 1985 in the "old" Safety Office. He had been Carracioli's immediate supervisor in the

post 51-L reorganized Systems Safety Office. Livingston was also aware of the charter revisions of

the Safety Office and those of related offices as the modifications concerned safety. Livingston

recognized that the position announced in the CPP was not a general lead engineer but one within the

field systems safety for the space shuttle. The position was not related to or responsible for shuttle

payloads nor for a pending future project but exclusively created in post 51-L systems safety

operations of the NSTS. Livingston testified that in conducting the interviews and assessing the

information obtained, he judged the information in light of the position requirements. He testified

when comparing ability and performance he viewed Carracioli as the superior candidate. He also

testified that while Mr. Hollich had substantially more general experience as an aerospace engineer,

28

Carracioli's experience in systems safety was markedly superior. Livingston further testified that he believed that Hollich's SF-171 overstated or erroneously stated Hollich's systems safety experience.[6]

During the interview Mr. Livingston annotated an outline he had prepared earlier. The outline generally followed the KSOCs and also referred to additional categories that included experience, training and "elements" which in turn included knowledge of systems safety, NSTS elements experience in external tank, revised solid rocket motor, solid rocket booster, advanced turbo pump (ATP), advanced solid rocket motor and shuttle main engine. The relevant experience included NSTS level II experience.[7] He also addressed knowledge, theories and principles of aerospace engineering and the knowledge of systems safety interactions with aerospace systems environments. The outline included questions related to the skill in planning, managing and directing innovative and technical programs as well as the opportunity for the candidate to discuss their qualifications and career plans. One form was completed for each candidate. (Hollich's outline, Defendant's Exhibit #21; Carracioli's outline, Defendant's Exhibit #20). Livingston testified that while Hollich claimed to have been involved in "systems safety" after leaving the old Safety Office in 1985, Livingston believed that such safety experience would "weak." Livingston testified that Hollich left the Systems Safety Office to go to the Integration Lab where he worked on the Space Station Project. Livingston concluded that while Hollich listed two jobs as being systems safety related he questioned how much systems safety work could have been done given the organizational structure of those branches. Livingston stated that in the post 51-L safety environment, systems safety work would not be done

---

[6]     Mr. Hollich testified that Livingston did not ask him about the alleged deficiencies in his application during the interview.

[7]     Level II experience is at the NSTS level. The contractor is Level IV, MSFC is III and headquarters is Level I. Presentations above level was a function of the job. Carracioli had made such presentations.

29

by the Integration Lab or other branches but, rather, would be performed by the new Systems Safety Office. For example he testified that he had continued to monitor the Space Station from the "old" Safety Office when Hollich went to the Integration Laboratory. He testified that he had "real doubts" about the amount of systems safety work that Hollich could have been doing. He observed that systems safety work would have been outside of the charter of Mr. Crumbley's organization. He also stated that when meetings were held on the project, a representative of the Safety Office was present. While Mr. Hollich may have been present at such a meeting, he was not there to speak for systems safety. Livingston further questioned Mr. Hollich's representation that he was involved in the TSS (Tethered Satellite Systems Program) while a member of the "old" Safety Office under the supervision of Mr. Walker. Livingston stated that he had been assigned to the TSS Program and that Mr. Hollich had been assigned to the External Tank. He stated that he, not Hollich, was the Lead on the TSS Program and that he had never received assistance from Hollich. He also indicated that Hollich's claim of service on the Source Selection Evaluation Board as a safety representative was in error because Les McGonagle was the Systems Safety Office representative on that board. Livingston concluded that while Mr. Hollich had more experience in both management and aerospace engineering, he had less experience in the functions that would be performed by the successful candidate in the Safety Office in the post 51-L environment. Livingston also knew that Carracioli's management experience had been developed at a trying and critical time for MSFC following the Challenger accident.

Mr. Hollich correctly observed that the CPP and the attendant KSOCs were confined to the post 51-L environment. Mr. Hollich also correctly observes that Mr. Carracioli's experience prior to October 1985 was as a System and Test Engineer at the TVA Bellefonte Nuclear Plant and

was not related to aerospace engineering. Mr. Hollich testified that when he left the Safety Office in 1985, he was given systems safety responsibility at the direction of Mr. Crumbley in the Integration Laboratory. He identified a "position description" describing an AST Flight Systems Safety Aerospace Engineering GS-861-12 as having been provided to him by Mr. Crumbley as his job description. (Plaintiff's Exhibit #23). The exhibit clearly indicates that it is in fact Flight Systems Safety oriented. Mr. Crumbley testified, however, that he did not recall giving the position description to Mr. Hollich. He stated that he did not recognize the document. Both Robert Crumbley and the Director of the Personnel Office noted that the position description indicating Flight Systems Safety functions performed by Mr. Hollich after his transfer to the Integration Laboratory was not a "official" position statement in that it did not bear an official classification, an approval signature nor position number. Ms. Vicki Crawford, an employee with MSFC's personnel office for thirty-two years, testified the document (Plaintiff's Exhibit #23) appeared to be a draft. Mr. Crumbley further testified that he would not have had Mr. Hollich who was then a GS13 performing GS12 functions as indicated in Plaintiff's Exhibit #23. The August 21, 1984 charter for the Integration Laboratory, Space Station Systems Division, which included Mr. Crumbley's organization, did not include systems safety among its primary responsibilities. Mr. Crumbley testified that the Space Station Integration Laboratory would have had little flight safety engineering in 1985 through 1988 because the Space Station existed on "paper" and the NSTS Program was actually flying. Mr. Crumbley testified that while at the Integration Laboratory, Mr. Hollich had been designated as a Senior or Lead Engineer on various projects.

Livingston also relied upon his own observations of Hollich from their days together in the "old" Safety Office. Livingston testified that during the period, Mr. Hollich would occasionally

31

spend time on his outside business which Livingston believed to be a gun shop. Livingston noted that

Hollich also occasionally sold items in the "old" Safety Office or solicited orders from co-workers.

Livingston did not believe Hollich's apparent inattention to his duties to be of sufficient importance

to report it to Mr. Walker. He testified that had he believed it interfered with Hollich's work he

would have made such a report. Livingston testified that in order to determine whether his

recollection concerning Hollich's work in the "old" Safety Office was correct, he reviewed files

maintained in the "new" Safety Office which were from that period. Livingston stated that he

reviewed the documents and also satisfied himself that Hollich had not worked on the TSS Program

but had been assigned exclusively to the External Tank.[9/] Livingston testified that he did not telephone

Mr. Crumbley to ask him about Hollich's work or question him about the functions of the office.

Charles Mauldin, in his testimony, stated that he was aware that Livingston was able to compare his

experiences with Hollich and Carracioli. Mauldin knew that Livingston had had an opportunity to

observe Hollich in the "old" Safety Office when they were co-workers and was, therefore, in an

excellent position to judge capabilities of both Carracioli and Hollich.

## APPLICABLE LAW

In order to prove the proffered reasons for the employment decision made was a

pretext, a plaintiff must show that the employer did not honestly believe its proffered explanation.

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (Stating that the inquiry is

"Whether the employer gave an honest explanation of its behavior."). *See Wolff v. Buss (America),*

---

[9/]     Hollich testified that he was specifically assigned to various projects including TSS directly by Mr. Walker
and was not supervised nor did he work directly with Livingston while performing those tasks.

*Inc.*, 77 F.3d 914, 191 (7th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S.Ct. 175, 136, L.Ed.2d 116 (1993). "[F]or an employer to prevail [the finder of fact] need not determine that the employer was correct in its assessment of the employee's performance; it need only to determine that the defendant in good faith *belief* plaintiff's performance to be unsatisfactory ...." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982). (Emphasis in original). As this Circuit has held, "[i]f an employer selects the person it believes is less qualified, an argument of pretext ordinarily will fail." *Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988) (*quoting Clark v. Huntsville City Bd. of Education*, 717 F.2d 525, 527 (11th Cir. 1983). The court does not "sit as a super-personnel department or determine whether the employer exercise prudent business judgment." *Heerdink v. AMOCO Oil Co.*, 919 F.2d 1256, 1260 (7th Cir. 1990), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (*quoting LaSalle Nat. Bank v. County of DuPage*, 856 F.2d 925 (7th Cir. 1988), *cert. denied*, 489 U.S. 1081, 109 S.Ct. 1536, 103 L.Ed.2d 840 (1988)). The ultimate issue remains whether the employer has exercised discriminatory intent. Here, the defendant does not dispute that Hollich was qualified for the challenged position. However, employment discrimination laws do not require an employer to hire or promote even the most qualified applicant. *McCarthney v. Griffin-Spalding County Board of Education*, 791 F.2d 1549, 1552 (11th Cir. 1986). While Livingston confirmed in his testimony that at the time of the interview he knew Hollich had more formal education, more years of aerospace engineering experience and had taken more course in engineering and safety than had Paul Carracioli. He also stated that during the interview and on his SF-171 Hollich appeared to have claimed more years in Flight Systems Safety experience than Carracioli. Livingston, however, stated that he did not believe Hollich's claim of ten years of Flight Systems Safety experience and had reservations about the accuracy of Hollich's recollection.

Livingston believed that Hollich's Flight Systems Safety experience was pre-51-L and was therefore inconsistent with the operational processes in place in the new Systems Safety Office. He specifically felt that Hollich was not familiar with the new NSTS 22254 Risk Matrix. The 22254 Matrix required detailed pre-flight safety analysis by the support teams created after the 51-L tragedy. The Matrix was evolved through efforts of the teams to predict failure probabilities in flight systems and the consequences of such failures. Livingston understood that Carracioli would not be required to learn the system which had been implemented during his tenure or to catch up with a new process as would have been required of Hollich.

After reviewing the exhibits and the testimony of the witnesses, the court is persuaded that Livingston (1) believed Carracioli to be the superior candidate and (2) that for the given job at issue, Carracioli was in fact the superior candidate despite Hollich's greater number of years in aerospace engineering and despite his claimed years of experience in Flight Systems Safety.

Mr. Hollich has also contended that Livingston was biased in favor of Carracioli because he had been Carracioli's immediate supervisor. Hollich suggested in affidavits and in the examination of witnesses an impropriety in permitting Livingston as the evaluator of Carracioli to serve as the interviewer. MSFC Personnel Office representatives testified that there was in fact no such impropriety. The personnel representatives testified that only in rare circumstances not at issue here, would a supervisor be disqualified from serving as an interviewer or evaluator.[9] Moreover, a bias in favor of Carracioli is not actionable under the ADEA. Favoritism by an appointing official

---

[9]     Mr. Hollich also sought to prove the personnel office and Livingston improperly permitted Carracioli to submit his SF-171 after the closing date. Evidence that rules were bent or broken to give non-minority applicants an edge in the hiring process are viewed with suspicion. *Morrison v. Booth*, 763 F.2d 1366, 1373-74 (11th Cir. 1985). Here, however, the undisputed evidence is that such an extension was routine at MSFC in all CPP announcements.

toward one candidate is not evidence of the use of a discriminatory factor such as age in reaching employment decisions. *See, e.g., Womack v. Runyon*, 147 F. 3d 1298 (11th Cir. 1998).

After consideration of all evidence including the evidence offered in "direct case" the court concludes as a matter of fact that Hollich has failed to prove his age was a motivating factor in the decision to promote Paul Carracioli and failure to promote him to the Systems Safety Engineer Position of CPP-90-63-RE. By separate order judgment will be entered for the defendant.

As to the foregoing it is SO ORDERED this the 31st day of March, 1999.

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE